DAYHUFF v GENERAL MOTORS CORPORATION

Docket No. 78-5438. Submitted June 3, 1980, at Lansing.—Decided
    January 23, 1981. Leave to appeal applied for.

Flossie I. Dayhuff was killed and Cindy Dayhuff was injured when
    the car which Flossie was driving, and in which Cindy was
    riding, went out of control and rolled over. Plaintiffs, Gerald M.
    Dayhuff, individually and as administrator of the estate of
    Flossie I. Dayhuff, and Cindy Dayhuff, filed suit in Genesee
    Circuit Court against defendants General Motors Corporation,
    manufacturer of the car, Vic Canever Chevrolet, Inc., the
    dealer which sold the car, and Acme Auto Stores, the company
    which replaced the original rear tires on the car. Plaintiffs
    alleged that the rear axle of the car was defective and caused
    the left rear wheel to wobble, which, in turn, enlarged the lug
    holes in the wheels and that the holes finally became so
    enlarged that the wheel came off the car, causing the car to go
    out of control and roll over. Defendants denied that the axle
    was defective and contended that the wheel came off because
    the lug nuts were not properly tightened. A jury trial resulted
    in a verdict in favor of plaintiffs and against GM, and no cause
    of action against Vic Canever Chevrolet or Acme Auto Stores.
    Judgment was entered on the verdict, Ollie B. Bivins, J. GM
    appeals, seeking judgment n.o.v. on the ground that plaintiffs
    failed to establish that the bent axle flange was a defect
    attributable to the manufacturer and that it was a proximate
    cause of plaintiffs' injuries. Held:

    1. Judgment n.o.v. is appropriate only if the evidence is
    insufficient as a matter of law to support judgment for the
    nonmoving party. Judgment n.o.v. is not appropriate here
    because reasonable minds could honestly disagree as to

REFERENCES FOR POINTS IN HEADNOTES
[1] 63 Am Jur 2d, Products Liability §§ 10, 134.
[2, 3] 63 Am Jur 2d, Products Liability §§ 22 et seq., 135.
[4] 75 Am Jur 2d, Trial § 360.
[5] 5 Am Jur 2d, Appeal and Error § 886.
[6] 31 Am Jur 2d, Expert and Opinion Evidence § 36.
[7] 63 Am Jur 2d, Products Liability §§ 20, 23, 80.
[8] 5 Am Jur 2d, Appeal and Error § 948.

whether plaintiffs had satisfied their burden of proof to establish a reasonable probability that the defect was attributable to the manufacturer and that the axle flange was the proximate cause of plaintiffs' injuries. These questions were properly left within the province of the jury.

2. The trial court did not err by permitting one of plaintiffs' expert witnesses to give an opinion without requiring that the data underlying his opinion be introduced into evidence. The rules of evidence state that such data is not required unless the court, in its discretion, requires that the data be introduced. Defendant GM did not invoke the discretion of the court.

3. There was no error in the trial court's refusing to give a standard jury instruction on nonproduction of witnesses or by instructing the jury to disregard defendant GM's argument as to plaintiffs' failure to produce a witness. The standard jury instruction was inapplicable here because the witness's testimony was equally available to defendant GM. That defendant never objected to the nonproduction of the witness nor did it demand his production. The court's instruction did not prejudice GM. Under the circumstances of this case, it would not be appropriate to draw an adverse inference from the nonproduction. The instruction that the court gave was proper.

4. GM's contention that plaintiffs' expert witness conducted tests the results of which were inadmissible because the conditions of the test were dissimilar to the actual conditions leading up to the accident is to no avail. For the purposes of the tests conducted, it was unnecessary to exactly recreate the conditions on the vehicle at the time of the accident.

5. GM's contention that the trial court erred by refusing to allow its expert witness to testify as to the results of experiments he conducted is a close question. However, because this witness attempted to reproduce the conditions caused by the bent flange and it was critical that the test flange be identical to the allegedly defective flange, there was no error in the trial court's ruling as it did.

6. The trial court did not err by reinstructing the jury that they must reconsider their verdicts. A jury verdict rendered upon instructions for redeliberation because of a defect need not be reversed, even though it results in a substantial reassessment, where the trial court does not seriously compromise the jury's free exercise of judgment on the factual merits.

Affirmed.

1. PRODUCTS LIABILITY — DEFECT — BURDEN OF PROOF.

A plaintiff in a products liability case has the burden of establish-

ing that the product was defective when it left the manufacturer.

2. PRODUCTS LIABILITY — DEFECT — BURDEN OF PROOF.

A plaintiff in a products liability case against the manufacturer, where an accident is caused by a defect in the product, is not obligated to eliminate all possible causes of the accident consistent with the view that there was no manufacturing defect.

3. PRODUCTS LIABILITY — DEFECT — BURDEN OF PROOF — REASONABLE PROBABILITY.

A plaintiff in a products liability case sustains his burden of establishing that when the product left the manufacturer it was defective by establishing with direct or circumstantial evidence a reasonable probability that the defect is attributable to the manufacturer.

4. PRODUCTS LIABILITY — COMPARATIVE PROBABILITY — TRIER OF FACT.

Questions of comparative probability in a products liability case are to be resolved by the trier of fact.

5. APPEAL — MOTIONS — JUDGMENT NOTWITHSTANDING THE VERDICT.

The Court of Appeals, when reviewing the grant of a motion for a judgment notwithstanding the verdict, must give the nonmoving party the benefit of every reasonable inference that could be drawn from the evidence; the grant of a defendant's motion for a judgment notwithstanding the verdict is improper if reasonable minds could honestly disagree as to whether the plaintiff has satisfied his burden of proof on the necessary elements of his cause of action.

6. WITNESSES — EVIDENCE — EXPERT WITNESSES — OPINION — UNDERLYING DATA — RULES OF EVIDENCE.

The rules of evidence do not require that data underlying an expert witness's opinion be introduced into evidence; the trial court, however, in its discretion, may so require (MRE 703).

7. PRODUCTS LIABILITY — EVIDENCE — TEST RESULTS — DISCRETION.

The admission of test results into evidence in a product liability case is within the wide discretion of the trial court.

8. APPEAL — JURY VERDICT — DEFECTIVE VERDICT — REDELIBERATION.

A jury verdict rendered upon instructions for redeliberation because of a defect need not be reversed, even though it results in a substantial reassessment, where the trial court did not

seriously compromise the jury's free exercise of judgment on the factual merits.

*Trembley, Bueche, Failer & Moore,* for plaintiffs.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, P.C.* (by *Jeannette A. Paskin),* for defendant on appeal.

Before: DANHOF, C.J., and M. J. KELLY and G. R. CORSIGLIA,* JJ.

PER CURIAM. Defendant General Motors Corporation appeals as of right from a jury verdict against it in the amount of $250,000 for Cindy Dayhuff; $1,690.48 for Gerald Dayhuff, individually; and $420,000 for the estate of Flossie I. Dayhuff.

This action arose out of an automobile accident which occurred on June 11, 1971. On that date, Flossie Dayhuff was driving the Dayhuff's 1970 Chevrolet station wagon north on I-75 freeway with eight passengers. Just after they passed a semi-trailer, Flossie Dayhuff lost control of the car, it swerved into the freeway median, started to skid sideways, and then rolled over three times. Flossie Dayhuff and Sandra King were killed in the accident. It was later discovered that the left rear wheel had separated from the car when the enlarged holes of the wheel spider allowed it to come off over the lug nuts. The cause of that condition was the main contested issue at trial. Plaintiffs sought to show that the axle flange was convex causing improper wheel contact which allowed motion to enlarge the wheel holes. GM sought to show that the wheel lug nuts were insufficiently tightened causing the same condition.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

On appeal, GM seeks judgment n.o.v., alleging that plaintiffs did not establish that the bent axle flange was a defect attributable to the manufacturer and that it was a proximate cause of plaintiffs' injury.

A plaintiff in a products liability case has the burden of establishing that the product was defective when it left the manufacturer. He is not, however, obligated to eliminate all possible causes of the accident consistent with the view that there was no manufacturing defect. He sustains his burden when he establishes with direct or circumstantial evidence a reasonable probability that the defect is attributable to the manufacturer. *Holloway v General Motors Corp (On Rehearing)*, 403 Mich 614, 621; 271 NW2d 777 (1978). Questions of comparative probability are to be resolved by the trier of fact. *Id.*

We first note that judgment n.o.v. is appropriate only if the evidence is insufficient as a matter of law to support judgment for plaintiff. In reviewing such a motion, we must give the nonmoving party the benefit of every reasonable inference that could be drawn from the evidence. If reasonable minds could honestly disagree as to whether plaintiffs have satisfied their burden of proof, judgment n.o.v. is improper. *Cormack v American Underwriters Corp,* 94 Mich App 379, 382-383; 288 NW2d 634 (1979).

Plaintiffs' evidence showed that the Dayhuff vehicle, which had been purchased from Vic Canever Chevrolet, Inc., had pulled to the left from the time it was new. Gerald Dayhuff returned the vehicle to the dealer numerous times seeking a solution to the problem. At 1,000 miles the rear tires showed excessive wear. Dayhuff was instructed by the dealer to place more weight in the

car. At 5,000 miles the left rear wheel was worn enough to be unsafe., Dayhuff replaced it with the spare wheel. When the spare wheel and tire were removed from the car, a rejection tag which referred to a defective axle was found tied to the car underneath the spare. Dayhuff met a GM representative, Joseph Stanzel, at another dealership which examined the vehicle's rear end. Dayhuff testified that they had discovered that the car was out of specification and that they had written a service order to replace the entire rear end but then changed their minds and claimed it was repaired after they had worked on it. Dayhuff testified that the car still pulled to the left. When he returned it again to Vic Canever Chevrolet, he was told that the tires were at fault.

Dayhuff then took the car to a Firestone tire dealership which examined the tires and found nothing wrong. Dayhuff again returned to Vic Canever Chevrolet without result. He testified that the left rear tire was worn very badly and the right rear tire was also wearing but the front tires were in very good condition. At approximately 15,000 miles Dayhuff had the two rear tires replaced at the Acme Auto Store. He testified that the car still pulled to the left.

Plaintiffs' expert witness, David Felbeck, examined the left rear wheel and took pieces of the failed metal to an electron microscopist for examination. In the resulting pictures, Felbeck found fatigue striations which are characteristic of a force with high and low and reverse cyclic variations over time. The striations indicate that the wheel was subjected to many, many stress cycles during the growth of the cracks—meaning that the car had been driven many thousands of miles. Felbeck then examined the left rear axle flange

and found that the flange was not flat but was evenly distorted .024 inches in a conical shape. He made a stress analysis and tested the hardness of the flange in order to determine whether it could have been plastically deformed by some force applied on the circumference of the flange. He concluded that the force required to distort the flange would be 12,200 foot-pounds. He examined the flange and the whole axle to determine where and how such a force could have been applied. Since he found no damage of any kind to the relatively delicate surfaces of the flange, he concluded that it had to have been bent at some time prior to installation on the car. In Felbeck's opinion the wheel became progressively weakened because of the development of fatigue fractures around the lug bolt holes and wobbled or came off causing loss of control.

Jay Bolt, a mechanical engineer, testified on behalf of plaintiffs that the left rear axle flange was convex, which meant that the wheel spider had to be deflected some amount before the wheel could make contact at its outer contact circle. If the lug nuts do not provide sufficient pressure at the outer contact circle to transmit the torque which drives the car, a gradual motion will develop and a loosening will occur. By doing three tests, he found that it took 30 foot-pounds of torque to achieve outer contact with the flange (on a normal flange contact would first be made at the outer contact circle). He stated that normal specifications call for 70 pounds of torque to tighten the wheel to the flange. He testified that if one applied 70 pounds of torque to the nuts over this bent flange normal contact force would not be achieved since 30 pounds of the torque would be used up in deflecting the wheel to conform with the deformed

flange. In his opinion, due to the convex flange, insufficient force existed at the outer contact circle on plaintiffs' car. This could have allowed a slight motion to occur, leading to stress and cracking of the bolt holes, and ultimately, to wobbling which could have led to a loss of control. In his opinion, the flange was manufactured in the convex condition, but he admitted that it could have been bent in the accident.

We conclude that judgment n.o.v. is inappropriate in this case because reasonable minds could honestly disagree as to whether plaintiffs had satisfied their burden of proof to establish a reasonable probability that the defect was attributable to the manufacturer and that the convex flange was the proximate cause of plaintiffs' injuries. Thus, the questions are within the province of the jury. This case is not like *Kupkowski v Avis Ford, Inc,* 395 Mich 155; 235 NW2d 324 (1975), in which there was no known positive fact from which the jury could draw a reasonable inference. Here, although GM's experts testified that the bend could not have occurred in the manufacturing process, the proofs submitted by plaintiffs support a reasonable inference that the defect is attributable to the manufacturer because it could not have happened after installation on the vehicle.

GM next argues that the trial court erred in permitting plaintiffs' expert witness, Jay Bolt, to give an opinion based upon hearsay information. In support of its argument, GM cites two cases predating the Michigan Rules of Evidence. Under MRE 703, the data underlying an expert's opinion is not required to be in evidence, but the trial court, in its discretion, may so require. *Tiffany v The Christman Co,* 93 Mich App 267, 280; 287

NW2d 199 (1979). In the present case, GM did not invoke the trial court's discretion in this regard. Thus, we find no error. We note that GM thoroughly cross-examined the witness as to the basis of his opinion.

GM also argues that the trial court erred in failing to give SJI 5.01(1) and in instructing the jury to disregard GM's argument on plaintiffs' failure to produce Professor Datsko at trial.

Joseph Datsko, a teacher of mechanical engineering at the University of Michigan, was to be one of plaintiffs' witnesses and was the only one to visit GM's axle manufacturing facility in St. Catharines, Ontario.

On April 18, 1978, prior to the trial, GM deposed Joseph Datsko. GM questioned Datsko regarding his visit to St. Catharines, Ontario and his findings there.

In his opening statement, plaintiffs' counsel stated:

"Lastly, Mr. Bolt also consulted with Mr. Datskool *[sic]*, who is a processing engineer at the University of Michigan. Mr. Datskool will show you that he went to the St. Catherine's *[sic]* plant, and that he ascribes this defective flange due to a failure of the heat treat process, that it did fail, that it is set by human beings, and that it well could have been made in that plant."

However, plaintiffs never called Datsko as a witness.

Counsel for GM questioned Jay Bolt on cross-examination regarding information obtained from Datsko and the extent to which Bolt relied on Datsko's findings. Further, in his final argument counsel said:

"When Mr. Bolt discovered in some fashion, probably

by talking to Joe Datsko, that he couldn't make an axle flange in that condition, he had to have some explanation for it. How did it get that way? Who made it that way? Well, allegedly Joe Datsko told him.

"And, I want you to bear this in mind: And, I know you will. I shouldn't say that. Mr. Failer told us in his opening statement, among other things, and he used these words: 'Lastly, Mr. Bolt also consulted with Mr. Datsko, who is a processing engineer at the University of Michigan. Mr. Datsko will show you that he went to Saint Catharines plants—plant,' and then he goes on to say what he learned there and what he was gonna testify to.

"What did he testify to? Anything? Mr. Bolt's opinion was predicated on Mr. Datsko's opinion. How did Mr. Datsko arrive at his opinion and what is it?

"Well, as I say, we would have loved to try this case on Mr. Bolt's theory of machining. And, we aren't at all reluctant to try it on his theory of a defectively manufactured axle flange. He's just as wrong on one as he is on the other.

"But somebody, somebody was going to come here and tell us how we made it that way. That was Mr. Datsko. And, Mr. Datsko never showed up. Do you know why? Mr. Datsko would not have testified that it is possible to make a flange in that fashion. You have a right to believe that since they didn't bring Mr. Datsko here, had he been here he would have testified that this flange could not be made in this fashion at any axle plant.

"They have completely failed, ladies and gentlemen, to produce any evidence in support of their theory, not one bit. And, the man that they said was gonna be here, upon which Mr. Bolt's conclusions rest, never showed up. 'Oh,' Mr. Failer will say, 'well, you could bring him in here. You could subpoena him; you could make him come.'

"I'm—I can't testify. There's nothing in the record as to what Mr. Wetherington and I did or didn't do in connection with Mr. Datsko. If we could have taken the witness stand, those questions might well be answered to your satisfaction. The fact is he was hired and paid

and consulted by Mr. Failer and Mr. Moore and Mr. Trembley, and he never showed up."

The trial court refused to give SJI 5.01(1).[1] The court held that Datsko was not under the "control" of plaintiffs since he was equally available to both parties and because GM could have read Datsko's deposition testimony into evidence.

We find no error in the court's refusal to give SJI 5.01(1). We find it inapplicable on the facts of this case because the testimony was equally available to the opposite party. The record shows that counsel for GM were communicating with Datsko during trial (although counsel claimed to have made an appointment with Datsko and that they had been armed with a subpoena but were unable to serve him). GM had Datsko's deposition which it could have used for impeachment purposes. See GCR 1963, 302. Although the trial court did not rule on plaintiffs' asserted "reasonable excuse", *i.e.,* that plaintiffs need not call Datsko since his testimony was elicited by GM on cross-examination of Jay Bolt, we believe plaintiffs should not be penalized by SJI 5.01(1) when they decide that their expert's testimony is unnecessary. Plaintiffs had introduced sufficient evidence attributing the defect to GM to present the issue to the jury. Datsko would have testified to his opinion of the specific process in which the axle *may* have become defective. It is unnecessary for plaintiffs to introduce proofs as to the specific origin of the defect. We note that GM neither objected to the nonproduction of Datsko nor demanded his produc-

---

[1] As applicable in this case, the instruction would read: "The [plaintiffs] in this case have not offered the testimony of [Joseph Datsko]. As this evidence was under the control of the [plaintiffs] and could have been produced by [them], and no reasonable excuse for the [plaintiffs'] failure to produce the evidence was given, you may infer that the evidence would have been adverse to the [plaintiffs]."

tion. Rather, GM sought the sanction of SJI 5.01(1).

GM claims that the court "compounded the error" by instructing the jury that it was improper for GM to argue that failure to produce Datsko would permit an adverse inference. In fact, the court instructed:

"Now, the attorney for Defendant General Motors Corporation indicated to you that since Mr. Datsko did not testify, you can infer that he would have testified that the flange could not be manufactured this way. I instruct you as follows: That the attorney for Defendant General Motors Corporation could have read the deposition of Mr. Datsko that he had the same as other depositions have been read to you."

This instruction did not prejudice GM. Since we conclude that an adverse inference was not justified on these facts, the instruction was appropriate.

GM next argues that the court erred in allowing Jay Bolt to testify as to the results of tests conducted on the Dayhuff axle. At trial, GM objected to Bolt's testimony relating to certain tests. The court ordered an offer of proof out of the hearing of the jury. Bolt testified that he ran three tests. For the first test, he put the axle in a vise, mounted the brake drum over the flange, and laid at least six strips of solder radially on the drum. He then placed a wheel assembly over the drum and torqued it a measured amount. Next he disassembled it and measured the compression of the solder to find the change of distance between the flange and the contact circle of the wheel. In the second and third tests, which he testified were more accurate, Bolt obtained another rim and cut the wheel rim from the spider so that measuring

gauges could be inserted between the spider and the flange. He then torqued the lug nuts various amounts and measured the distances. After extensive discussion, the trial court held that the tests were admissible.

GM objected that the tests in which Bolt used the cut-away spider were so dissimilar to the original condition as to be inadmissible. On appeal, GM also objects that the tests were dissimilar because Bolt did not "seat" the studs but instead drove them in with a hammer.

Admission of test results is within the wide discretion of the trial court. *Moldovan v Allis Chalmers Manufacturing Co,* 83 Mich App 373, 384; 268 NW2d 656 (1978), *lv den* 406 Mich 916 (1979), *cert den* 444 US 1034 (1980). We find no abuse here. The purpose of the tests, as found by the trial court, was to show that a bent flange would not have the same contact torque as a normal flange. As the tests were admitted to show that the contact force would be reduced, rather than to show exactly how much the contact force was reduced by the bend in the Dayhuff flange, it was unnecessary to exactly recreate the conditions existing on the Dayhuff vehicle.

GM also argues that the court erred in refusing to allow its expert, Gerald Confer, to testify as to the results of experiments with an axle bent in a configuration allegedly similar to that of the Dayhuff axle.

Confer testified that the Dayhuff flange would still safely operate the vehicle although there would be "a little bit of wheel run out". He based this conclusion on tests on another axle "I took * * * out of a used '70 Chevrolet station wagon * * * [which] we bent * * * in a hydraulic press". He said, "We bent * * * [it] * * * to conform to

* * * the Dayhuff flange. I then * * * put it in a Chevrolet * * * and measured the run out of the wheel in that assembly".

On questioning by the court and special cross-examination by plaintiffs, he admitted that he did not know what the run out of the Dayhuff flange was, he did not bend the shaft himself, and did not personally measure the shaft after it was made. The court ruled that there was no proper foundation for the testimony. During a recess, Confer made comparison measurements ("eyeballing") of the two shafts—he concluded they were the same. On voir dire, he admitted that the shaft was wavy, that he had only made measurements at some of the points on the flange (but they looked similar at the other points), and that it was not an exact replica. The court then sustained plaintiffs' renewed objection.

Again, the admission of this testimony was within the discretion of the trial court. Although we find this a close question, we conclude there was no reversible error in refusing to admit additional testimony relating to Confer's tests. Confer's experiments are distinguishable from Bolt's because Confer purported to reproduce the condition caused by the bent flange on the Dayhuff vehicle. Thus, it is critical that the test flange be identical to the Dayhuff flange. We note that the essence of Confer's testimony was presented before the trial court ruled.

GM next argues that the trial court erred in reinstructing the jury that they must reconsider their verdicts.

On October 2, 1978, the jury returned its verdict of $250,000 for Cindy Dayhuff, $125,000 for Flossie Dayhuff's estate, and $300,000 for Gerald Dayhuff.

Since Gerald Dayhuff individually was only enti-

tled to $1,690.48 in damages for Cindy Dayhuff's medical expenses, the verdict was clearly defective. GM moved to remit the verdict for Gerald Dayhuff down to $1,690.48, while plaintiffs argued that the jury misinterpreted the instructions as to the form of the verdict and so lumped the amount for the estate with Gerald Dayhuff's damages. Plaintiffs requested that the jury be questioned as to its verdict.

After argument, the court decided to instruct the jury that the verdict was "irregular or defective". He thus reread the instructions as to Gerald Dayhuff and the instruction as to wrongful death (including Gerald Dayhuff's status as representative of the estate). First, he instructed them to reconsider the Gerald Dayhuff portion of the verdict but, after more argument, instructed them to also reconsider the claim as to the estate.

After some deliberation, the jury asked what Gerald Dayhuff is entitled to. On agreement by counsel, the court instructed them that he is entitled to $1,690.48 individually. The jury thereafter rendered a verdict of $1,690.48 in favor of Gerald Dayhuff and $420,000 for the estate of Flossie Dayhuff.

Michigan decisions indicate that even verdicts which on redeliberation must be substantially reassessed after discovery of a defect do not create grounds for reversal where the court does not seriously compromise the jury's free exercise of judgment on the factual merits. *Alvarado v Scutt,* 81 Mich App 421, 424-425; 265 NW2d 357 (1978).

We hold that the lower court's reinstruction did not compromise the jury's free exercise of judgment on the factual merits. It is apparent that the jury misunderstood the complex instruction and confused Gerald Dayhuff's role as representative of

the estate with his individual claim. The court properly exercised its discretion in submitting both claims for redeliberation.

Finally, GM argues that the court erred in granting plaintiffs' oral motion to amend the pleadings to conform to the proofs and that the cumulative effect of erroneous rulings resulted in reversible error. We find these arguments to be without merit.

Affirmed. Costs to plaintiffs.